IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LEONARD ALTOMARE,** : | |
|         Plaintiff, : | |
| : | |
| v. : | Civ. No. 24-2583 |
| : | |
| **UNITED STATES OF AMERICA,** : | |
|         Defendant. : | |

**Diamond, J.**                                                                                             **February 18, 2025**

## MEMORANDUM OPINION

Leonard Altomare alleges that he fell when trying to enter a Veterans Affairs facility because the United States had negligently failed to provide him with a wheelchair as soon as he arrived. (Doc. No. 1 ¶ 13.) Because, under the Federal Tort Claims Act, the Government is immune from Altomare's suit, the Court is without jurisdiction to hear this matter. 28 U.S.C. § 1346(b)(1). Accordingly, I will grant the Government's Motion for Summary Judgment. (Doc. No. 24.)

### I.      BACKGROUND

I have construed the facts and resolved all factual disputes in Altomare's favor.

On May 20, 2021, 83-year-old Altomare had an appointment to be fitted for a new cane or a wheelchair at the Veterans Affairs Medical Center in Philadelphia. (Doc. No. 24-1 ¶¶ 1-2; Doc. No. 27-2 at 1). A private doctor treats him for his service-related asbestosis, a condition that sometimes causes breathing difficulties. (Doc. No. 27-5 at 12:6-11, 17:19-22; Doc. No. 27-7 at 2-3, 5 of 7.) His wife Jacqueline drove him to the VAMC parking garage because the facility's patient drop-off and handicapped parking areas were full. (Doc. No. 27-5 at 18:5-19:17.)

It was a "bad day" for Altomare's breathing. (Doc. No. 24-6 at 18:16-17; Doc. No. 27-5 at 12:7-11.) Mrs. Altomare "really didn't want to go [to the fitting appointment], but [Altomare] didn't want to cancel." (Doc. No. 27-5 at 12:11-12.) Given his breathing difficulties that day, Altomare could not walk without assistance. (Id. at 12:14-25.) Upon their arrival, Mrs. Altomare went inside the VAMC to get a wheelchair. (Doc. No. 24-1 ¶ 8; Doc. No. 27-5 at 12:14-13:11.) The facility entrance had seven wheelchairs on hand and could procure more from other departments as needed. (Doc. No. 27-6 at 17:8-18:15.) Although wheelchairs are usually available within 10 minutes of arrival, Mrs. Altomare was told that none would be available for an hour. (Doc. No. 24-2 at 3 of 5; Doc. No. 27-6 at 18:7-20:20.)

Mrs. Altomare began to cry and was approached by "Gina," whose parent was also a VAMC patient. (Doc. No. 24-2 at 3 of 5; Doc. No. 27-5 at 13:22-25.) Gina offered her father's "rollator"—a mobility device with four wheels, two push handles with handbrakes, and a backless seat—to assist Altomare. (Doc. No. 24-1 ¶¶ 10-11.) This was the first time Altomare or his wife had used a rollator. (Doc. No. 24-6 at 19:3-7, 23:18-20; Doc. No. 27-1 ¶ 19.)

Altomare sat in the rollator's seat while Mrs. Altomare and Gina, each holding a different handle, pushed him through the parking garage. (Doc. No. 24-1 ¶¶ 12-13; Doc. No. 27-5 at 14:9-12.) He was facing backward. (Doc. No. 24-6 at 19:11-16; Doc. No. 27-5 at 14:9). According to Mrs. Altomare, they were "going very fast to get him in because he was gasping for air." (Doc. No. 27-5 at 23:4-8.) She did not ask anyone else for assistance in the "dimly lit" garage. (Id. at 14:12-17.) Mrs. Altomare was looking at her husband; she was not watching where she was going. (Id. at 26:13-17.) She thought she could thus prevent him from falling off the rollator, which had only a backless seat and had no strap. (Id.)

2

While Mrs. Altomare and Gina were "rushing" through the garage, the rollator tipped and Altomare fell backward onto the concrete floor. (Doc. No. 24-6 at 19:18-20:5; Doc. No. 27-5 at 14:15-21, 26:13.) Neither Altomare nor his wife knows what caused the rollator to tip. (Doc. No. 24-1 ¶¶ 22-23; Doc. No. 27-1 ¶¶ 22-23.) Indeed, the Altomares have given different versions of the fall: that he fell getting out of his car; that he fell backward while his wife and Gina pushed him backward on the rollator; and that he tripped on a dangerous condition in the garage. (Doc. No. 24-2 at 3-4 of 5; Doc. No. 24-3 at 1 of 3; Doc. No. 24-4 at 1 of 4.)

Altomare was taken to the VAMC Emergency Department and then transferred to Jefferson Hospital, from which he was discharged the same day. (Doc. No. 24-1 ¶¶ 26-27; Doc. No. 24-6 at 25:5-25.) Over a month later, after he was diagnosed with an "incomplete spinal cord injury secondary to his fall," Altomare underwent spinal decompression and fusion surgery. (Doc. No. 27-8 at 1.) He was discharged to an inpatient rehabilitation facility on June 28, 2021, and his physical and neurological condition continued to improve through a December 6, 2021 medical follow-up. (Id. at 1-2.) He still has neck pain, with limited range of motion and difficulty holding his head up. (Doc. No. 27-7 at 1 of 7.)

Proceeding under the FTCA, Altomare brought the instant action on June 12, 2024. (Doc. No. 1); 28 U.S.C. § 1346(b)(1). He alleged that the United States' failures to correct a dangerous condition in the VAMC garage and to provide him with a wheelchair as soon as he arrived at the facility constituted negligence under Pennsylvania law, thus causing him injuries. (Doc. No. 1 at 3-4 of 5.)

## II.   LEGAL STANDARDS

### A.   Federal Tort Claims Act and State Law

The FTCA allows certain civil actions to proceed against the United States, if threshold

3

jurisdictional requirements are met. See 28 U.S.C. § 1346; CNA v. United States, 535 F.3d 132, 141 (3d Cir. 2008). "The FTCA operates as a limited waiver of the United States's sovereign immunity." White-Squire v. USPS, 592 F.3d 453, 456 (3d Cir. 2010). A plaintiff may recover for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable." 28 U.S.C. § 1346(b)(1). Accordingly, "an FTCA claimant must show that the government act or omission, if committed by a private person, would breach an independent state law duty." Bosco v. United States, 164 F. App'x 226, 229 (3d Cir. 2006). "And in the unique context of the FTCA, all elements of a meritorious claim are also jurisdictional." Brownback v. King, 592 U.S. 209, 217 (2021).

Under Pennsylvania law, a plaintiff alleging negligence must prove:

(1) a duty or obligation recognized by law;
(2) a breach of that duty;
(3) a causal connection between the conduct and the resulting injury; and
(4) actual damages.

Grossman v. Barke, 868 A.2d 561, 566 (Pa. Super. Ct. 2005).

### B.     Summary Judgment

"[I]f there is no genuine issue as to any material fact [then] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must show the absence of any genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). An issue is material only if it could affect the result of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The district court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Hugh v. Butler Cnty. Fam. YMCA, 418 F.3d 265, 267 (3d Cir. 2005). If the court then determines that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. See

4

Celotex Corp., 477 U.S. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

### III. DISCUSSION

Altomare acknowledges that he has not made out that there was a dangerous condition in the VAMC garage. (Doc. No. 27 at 2.) Accordingly, he now charges the Government with negligence based only on its failure to provide him with a wheelchair when he arrived at the VA facility. (Id.)

#### A. Discretionary Function Exception to Liability

The Government first argues that this exception divests the Court of jurisdiction here. (Doc. No. 24 at 20-24; Doc. No. 31 at 2-6.) I do not agree.

The FTCA provides only a limited waiver of the immunity from suit that the Government otherwise enjoys. 28 U.S.C. § 1346. The United States retains immunity from:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). This provision thus "eliminat[es] jurisdiction for claims based upon the exercise of a discretionary function on the part of an employee of the government." Baer v. United States, 722 F.3d 168, 172 (3d Cir. 2013). "[T]he Government has the burden of proving the applicability of the discretionary function exception." S.R.P. v. United States, 676 F.3d 329, 333 (3d Cir. 2012).

I must first determine whether a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," eliminating the "element of judgment or choice." Id. If so, the exception does not apply. Id. Absent such a prescription, I must determine

5

"whether the challenged action or inaction 'is of the kind that the discretionary function exception was designed to shield.'" Id. (quoting Gotha v. United States, 115 F.3d 176, 179 (3d Cir. 1997)). The "focus of the inquiry is . . . on the nature of the actions taken and on whether they are susceptible to policy analysis." Id. (quoting United States v. Gaubert, 499 U.S. 315, 325 (1991)).

As to the first step, it is undisputed that "[n]o policy mandates the availability of wheelchairs." (Doc. No. 24 at 22; Doc. No. 27-1 at 2 n.1.)

The discretionary function exception will thus apply only if the VAMC's wheelchair distribution is "susceptible to policy analysis" and is the kind of action the exception was "designed to shield." S.R.P., 676 F.3d at 333. Altomare argues that even if the exception protects the Government's decision to provide VAMC patients with wheelchairs, it does not necessarily protect all its ensuing actions in executing this decision. (See Doc. No. 27 at 10-11.) I agree.

"The exception 'does not apply to every situation in which there is an actual option to choose between courses of action or inaction.'" S.R.P., 676 F.3d at 332. (quoting Gotha, 115 F.3d at 179). "Rather, it immunizes from second-guessing 'legislative and administrative decisions grounded in social, economic, and political policy.'" Id. (quoting Gotha, 115 F.3d at 179). The Third Circuit has explained that although an initial agency decision may be discretionary, subsequent actions by which the agency implements that decision commonly are not:

> It may be arguable that the [National Park Service's] initial decision to maintain parking at the Hospital Street lot was protected by the discretionary function exception. But assuming this were so, subsequent decisions concerning the Hospital Street lot were not necessarily protected.

Cestonaro v. United States, 211 F.3d 749, 756 (3d Cir. 2000); see also Berkovitz v. United States, 486 U.S. 531, 539 (1988) ("The discretionary function exception applies only to conduct that involves the permissible exercise of *policy judgment*." (emphasis added)).

6

The Government argues that wheelchair availability "directly relates to the purpose and mission of the VAMC in Philadelphia to provide healthcare to veterans." (Doc. No. 31 at 5.) This reasoning could apply to a multitude of pedestrian decisions by which the VAMC operates, however, like choosing the color of medical gowns or a brand of aspirin. The Government must show that its procurement and allocation of wheelchairs for a particular area in the VAMC facility is an "administrative decision[] grounded in social, economic, [or] political policy." Gaubert, 499 U.S. at 323; S.R.P., 676 F.3d at 333. Not surprisingly, it points to no such factors underlying the decision to allocate seven wheelchairs to the VAMC facility entrance. (See Doc. No. 24 at 22-24; Doc. No. 27-6 at 17-20; Doc. No. 31 at 6-7.) Rather, VA Nurse Manager Maxwell explained only that the entrance has seven wheelchairs and can request more from other departments, but not how or why this arrangement came about. (See Doc. No. 27-6 at 17-20.) The arrangement could hardly be "grounded in social, economic, [or] political policy." Gaubert, 499 U.S. at 323.

The Government nonetheless argues that so limiting the discretionary function exception would require Veterans Affairs "to procure enough wheelchairs to be available to any patient arriving at any of its 171 medical facilities and over 1,000 outpatient centers, in any department, at any time, without the ability to predict when, or how many, wheelchairs will be needed." (Doc. No. 31 at 5.) I do not agree.

The VA may in its discretion decide whether to provide wheelchairs to incoming patients. See Berkovitz, 486 U.S. at 539. The allocation of a particular number of wheelchairs to a particular area at a particular facility has no such policy underpinning. See id.; Gotha, 115 F.3d at 180 (Navy's failure properly to maintain a footpath "goes more to the issue of negligence rather than whether the issue of policy discretion is implicated"). Moreover, the Government has conflated separate issues: the jurisdictional determination I must make as part of the policy exception inquiry

is distinct from whether Altomare has made out negligence. See Gotha, 115 F.3d at 182 ("We conclude that the discretionary function exception is not applicable in this case. Our holding on the issue of jurisdiction, of course, is not intended to intimate any view on the liability of the government on the merits.").

In these circumstances, the Government has not shown how the VA's distribution of its wheelchairs at the Philadelphia VAMC is the type of action the discretionary function exception was "designed to shield." See Berkovitz, 486 U.S. at 536; (Doc. Nos. 24, 27-6, 31.) Accordingly, this exception does not bar the Court from exercising jurisdiction over Altomare's negligence claim. See 28 U.S.C. §§ 1346(b)(1), 2680(a).

## B. Corporate Negligence

The Government does not address whether under Pennsylvania law the VAMC had a duty to provide Altomare with a wheelchair as soon as he arrived at the facility. (See Doc. Nos. 24, 31); Grossman, 868 A.2d at 566 ("[E]stablishing a breach of a legal duty is a condition precedent to a finding of negligence."). Although I may not grant summary judgment "on grounds not raised by a party" without first giving "notice and a reasonable time to respond," I must, *mea sponte*, dismiss at any time if the Court lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3), 56(f); see also Desi's Pizza, Inc. v. City of Wilkes-Barre, 321 F.3d 411, 420 (3d Cir. 2003). I will thus address the duty question because it presents another potential bar to jurisdiction.

Altomare argues that the VAMC itself—not any individual employee—negligently failed to supply him with a wheelchair when he arrived. (See Doc. No. 27 at 9-11.) Accordingly, under Pennsylvania law, his claim sounds in "corporate negligence"—that is a collective entity's liability—rather than in vicarious liability. Thompson v. Nason Hosp., 591 A.2d 703, 707-08 (Pa. 1991). "A cause of action for corporate negligence arises from the policies, actions or inaction of

the institution itself rather than the specific acts of individual hospital employees." Welsh v. Bulger, 698 A.2d 581, 585 (Pa. 1997). Pennsylvania recognizes that hospitals and similar comprehensive healthcare centers owe four broad duties to their patients:

(1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;
(2) a duty to select and retain only competent physicians;
(3) a duty to oversee all persons who practice medicine within its walls as to patient care; and
(4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

Id. (quoting Thompson, 591 A.2d at 707); see also McClure v. Parvis, 294 F. Supp. 3d 318, 327 (E.D. Pa. 2018) (corporate negligence can also attach "to certain non-hospital entities" such as HMOs and nursing homes).

Here, the duty the VAMC purportedly breached by its corporate negligence was "to use reasonable care in the maintenance of safe and adequate facilities and equipment" in its wheelchair supply and allocation. See Welsh, 698 A.2d at 585. Yet, the FTCA provides a waiver of the United States' sovereign immunity only for "personal injury or death caused by the negligent or wrongful act or omission *of any employee* of the Government while acting within the scope of his office or employment, under circumstances where the United States, *if a private person*, would be liable." 28 U.S.C. § 1346(b)(1) (emphases added). Accordingly, under the FTCA, only if a person is liable would that liability be imputed to the United States. Id. Altomare has alleged that the VAMC, however, and not any person, was negligent. (See Doc. No. 27 at 9-11.)

The Ninth Circuit has held that an artificial entity like the VA is not a "person" for FTCA purposes. See Adams v. United States, 420 F.3d 1049, 1051-54 (9th Cir. 2005) (citing 28 U.S.C. § 2671). The Court noted that "employee of the government" as used in Section 1346(b)(1) was categorically defined in Section 2671 as:

9

> [1] officers or employees of any federal agency,
> [2] members of the military or naval forces of the United States,
> [3] members of the National Guard while engaged in training or duty,
> [4] *persons acting on behalf of* a federal agency in an official capacity, [and]
> [5] officer[s] or employee[s] of a Federal public defender organization, [with certain exceptions].

Adams, 420 F.3d at 1051 (alterations in original) (quoting 28 U.S.C. § 2671). The Court explained that Congress meant to limit "persons" as used in the FTCA to "natural persons" and not "artificial entities." Id. at 1052-54. The Court reasoned that the Section 2671 government employee list is comprised almost entirely of "employees that can be only human beings," and that, in crafting the FTCA, Congress was "concerned with federal employees being personally liable for actions taken within the scope of their employment," and thus imputed their wrongful acts to the agency that employed them. Id. at 1053-54.

No other Circuit has yet addressed the question of whether, under the FTCA, a federal agency is immune from suit when the underlying wrongful action is not alleged to have been undertaken by a specific agency employee. District courts in this Circuit have come to differing conclusions. Compare Mennecke v. Saint Vincent Health Ctr., No. 98-50 Erie, 2000 U.S. Dist. LEXIS 20006, at *16-20 (W.D. Pa. Mar. 31, 2000), and Schultz v. United States, No. 15-454, 2017 U.S. Dist. LEXIS 21856, at *13-19 (W.D. Pa. Feb. 16, 2017), with Daniels v. United States, No. 20-3893, 2021 U.S. Dist. LEXIS 108492, at *4-6 (E.D. Pa. June 1, 2021), and Boyle v. United States, 605 F. Supp. 3d 653, 659 (E.D. Pa. 2022) (citing Daniels, 2021 U.S. Dist. LEXIS 108492, at *2).

Because the Ninth Circuit's reasoning in Adams is particularly persuasive, I conclude that the VA is immune from the corporate negligence claim that Altomare seeks to bring, and that the Court is thus without jurisdiction to hear this matter.

10

### C. Causation

"[I]n the unique context of the FTCA, all elements of a meritorious claim are also jurisdictional." Brownback, 592 U.S. at 217. A plaintiff must prove that "the United States, if a private person, would be liable to the claimant" under state law both to survive a merits ruling and to establish subject matter jurisdiction. Id. at 218-19; 28 U.S.C. § 1346(b)(1). Accordingly, the Court would again lack jurisdiction over Altomare's FTCA claim if he could not make out causation. See Brownback, 592 U.S. at 219 ("[A] federal court can decide an element of an FTCA claim on the merits if that element is also jurisdictional.")

Under Pennsylvania law, a tortfeasor's conduct must be both the cause in fact and the proximate cause of the plaintiff's injury. Galullo v. Fed. Express Corp., 937 F. Supp. 392, 394 (E.D. Pa. 1996). Cause in fact is "but for" causation: that but for the tortfeasor's negligent conduct, the plaintiff's injury would not have occurred. Whitner v. Lojeski, 263 A.2d 889, 893 (Pa. 1970). "The determination of proximate cause is 'primarily a problem of law' and must, as a threshold matter, be 'determined by the judge and it must be established before the question of actual cause is put to the jury.'" Eckroth v. Pa. Elec., Inc., 12 A.3d 422, 427-28 (Pa. Super. Ct. 2010) (quoting Brown v. Phila. Coll. of Osteopathic Med., 760 A.2d 863, 868 (Pa. Super. Ct. 2000)).

Proximate causation "essentially regards 'whether the alleged negligence was so remote that as a matter of law, the defendant cannot be held legally responsible for the subsequent harm.'" Id. at 428 (quoting Holt v. Navarro, 932 A.2d 915, 921 (Pa. Super. Ct. 2007)).

> Therefore, the court must determine whether the injury would have been foreseen by an ordinary person as the *natural and probable outcome* of the act complained of. The court must evaluate the alleged facts and refuse to find an actor's conduct was the legal cause of harm when it appears to the court *highly extraordinary* that the actor's conduct should have brought about the harm.

11

Id. (emphases added) (quoting Holt, 932 A.2d at 921).  Pennsylvania law requires courts to consider: (1) "the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it"; (2) "whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible"; and (3) "lapse of time."  Id. (quoting Holt, 932 A.2d at 921); see also Restatement (Second) of Torts § 433 (Am. L. Inst. 1965).

In Eckroth, the electric company terminated a resident's power for nonpayment.  Id. at 425.  Two days later, the resident lit candles in the kitchen and bathroom, one of which fell over at night and started a fire in the home.  Id.  Four people perished.  Id.  The Superior Court ruled that the plaintiffs could not make out proximate causation because of: the number of factors contributing to the harm; the lack of a continuing force from the company's act; the harmlessness of the situation caused by the company's act unless acted upon by other forces; and the lapse of time between the company's act and the fire.  Id. at 428-29.  The court thus explained:

> [T]he residents' election to forego inherently safe lighting in favor of using an unattended open flame on a storage shelf as a nightlight during sleeping hours stands as an extraordinary breach of fire safety . . . not reasonably foreseeable as a normal and probable consequence of their loss of electric lighting nearly two days earlier.

Id. at 429.  Here, Altomare's claimed head and neck injuries were not "reasonably foreseeable as a normal and probable consequence" of the VAMC's "failure" immediately to provide a wheelchair.  See id. at 428-29; Restatement (Second) of Torts § 433.

First, although the failure to provide Altomare a wheelchair was a continuous force at the time of his injury, it created a situation that was harmless unless acted upon by other forces.  It is undisputed that there was no immediate need to bring Altomare inside the VAMC.  Altomare used

12

the wheelchair due to his breathing difficulty, but his appointment was for a cane or wheelchair fitting only, not his breathing problems (which his private physician treats). (Doc. No. 24-1 ¶ 1; Doc. No. 27-2 at 1; Doc. No. 27-5 at 12:5-13, 17:19-22; Doc. No. 27-7 at 2 of 7.) Mrs. Altomare testified that Altomare did not want to cancel the fitting appointment despite it being a "bad [breathing] day." (Doc. No. 27-5 at 12:7-22.) The lack of an immediately available wheelchair thus created a harmless situation that required the action of additional forces—such as Altomare's insistence to go inside the VAMC without one—to result in his injuries.

Moreover, at least six dangerous choices contributed to those injuries:

(1) the choice not to cancel the appointment or wait until a wheelchair became available, (Doc. No. 27-5 at 12:10-22);

(2) the choice to use a "rollator"—a device with which the Altomares were unfamiliar, (Doc. No. 24-1 ¶¶ 10-11; Doc. No. 24-6 at 19:3-7, 23:18-20; Doc. No. 27-1 ¶¶ 18-19);

(3) the choice to have Altomare sit in the device's backless seat without any seat strap, facing backward as he was pushed forward, (Doc. No. 24-6 at 19:14-25; Doc. No. 27-5 at 14:9-15, 26:12-16);

(4) the choice of Mrs. Altomare and Gina to operate the rollator handles separately while they pushed Altomare, (Doc. No. 24-1 ¶¶ 12-13);

(5) the choice to "rush" through a dimly lit parking garage, (Doc. No. 27-5 at 14:12-18, 26:12-16); and

(6) the choice of Mrs. Altomare to look at Altomare, not where she was going. (Id. at 26:12-16.)

Just as leaving "an unattended open flame on a storage shelf as a nightlight during sleeping hours" was "an extraordinary breach of fire safety," this series of poor choices was an

13

extraordinary breach of Altomare's safety, unrelated to the VAMC's "failure" immediately to provide him with a wheelchair. See Eckroth, 12 A.3d at 429.

Finally, the short lapse of time between Altomare's inability to get a wheelchair and his fall also weighs against finding proximate cause. There was no urgent need to bring Altomare immediately inside the VAMC for his fitting appointment. (Doc. No. 24-1 ¶ 1; Doc. No. 27-2 at 1; Doc. No. 27-5 at 13:6-14, 17:19-22.) Mrs. Altomare testified that she thought they should not have come, but Altomare refused to cancel. (Doc. No. 27-5 at 12:10-22.) Even after insisting that he would keep the appointment, the Altomares could have waited for a wheelchair and not subjected Mr. Altomare to the myriad dangers I have described. Altomare argues that "[his wife] did the best she could in a moment of desperation, unfortunately with disastrous results." (Doc. No. 27 at 11.) This "desperation" was entirely of her own creation, however. There was no need—and it made little sense—to place Altomare at immediate risk. The VAMC could not possibly have foreseen that Mrs. Altomare would do so as "the natural and probable outcome of" wheelchair unavailability. See Eckroth, 12 A.3d at 429.

In sum, Altomare cannot show that the VA's allocation of wheelchairs caused his injuries. Once again, under the FTCA, the inability to make out causation also divests the Court of jurisdiction. See Brownback, 592 U.S. at 217-18.

**IV.    CONCLUSION**

For the two alternative grounds I have discussed, this matter may not proceed further. I will thus grant the United States' Motion for Summary Judgment. (Doc. No. 24.) The Altomares' poor choices that I have discussed obviously bear on whether his comparative negligence bars any recovery. (See Doc. No. 31 at 7-9.) The Supreme Court has admonished, however, that once a court determines that it lacks jurisdiction, it may not then address any claimed affirmative defense.

See Brownback, 592 U.S. at 218.  Accordingly, I will not address the Government's persuasive comparative negligence argument.  (Doc. No. 31 at 7-9.)

An appropriate Order follows.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*
Paul S. Diamond, J.